## Titgen v. Smith et al.

208

*J. J. Speese,* for complainant.

*F. F. Truscott,* city solicitor; *G. C. Farrier* and *J. F. Ryan,* assistant city solicitors, for respondents.

GORDON, JR., P. J., June 17, 1949.—This case is a taxpayer's bill to restrain the appropriate municipal officials from entering into a contract with the Dual Parking Meter Company for the purchase of upward of 700 parking meters to be installed on certain streets in the Germantown area of the City of Philadelphia on the ground that that company, to which the contract had been awarded after competitive bidding, was not the lowest responsible bidder therefor; and the case is before us on bill, answer and proofs.

From the pleadings and testimony it appears that the purchase of the parking meters was authorized by the ordinance of May 11, 1948. Specifications were prepared and bids, duly invited by advertisement, were received on September 24, 1948. Bidders were notified by the specifications that they would be required to submit samples of the meters they were offering for inspection by the Committee on Engineering and Accident Records of the Philadelphia Highway Traffic Board,[1] which had been designated by the ordinance as

---

[1] The members of the committee were: Messrs. R. F. Tyson, N. E. Funk, Revelle Brown, William Canning and James T. Haviland.

an advisory committee to the directors of public safety and purchases and supplies in awarding the contract under the bids to be submitted. The advisory committee was authorized by the terms of another ordinance, and consisted of five citizens, prominent and respected in the business life of the city, and who voluntarily agreed to serve, in order that the city officials might have the benefit of their experience and advice in matters touching upon the welfare of the city and its municipal administration. Quite a number of bids were received and sample meters submitted. These meters were of three fundamentally different types, namely, (1) hand operated machines, (2) single-head automatic machines, and (3) double-head automatic machines, the latter being capable of separately controlling two adjoining parking spaces when placed between them. Unfortunately, the specifications as drawn did not classify the meters according to these types and ask for alternate bids on that basis, but invited bids for the sale of parking meters generally, the bidding being upon the basis of the price per machine. Two of the companies, offering hand-operated machines, appear to have been the lowest bidders in point of the price bid. Next above these was the Alfco Twin Meter Company, which offered a double-headed machine of the automatic type, known as the Alfco Meter. Although that machine was much higher in cost than the others, its ability to control two parking spaces at a time considerably reduced the number of meters that would be required for the same area, with the result that, after making allowance for that fact, it appeared to be the next higher bidder above the hand-operated machines referred to. The bid immediately next above the Alfco Meter was that of the Mayer-Hale Company, which offered a single headed automatic machine known as the Park-o-Meter. And finally, another single-headed

meter, known as the Dual parking meter, was offered by a company of the same name for a price slightly higher than that of the Park-o-Meter. Several other bids were received for meters at prices which were above all of the meters already mentioned, and, hence, they fall out of the picture in this controversy.

It will be seen from the foregoing that, apart from the hand-operated machines and the double-headed meter, the two lowest bids were for single-head automatic machines; the Dual parking meter at $66, and the Park-o-Meter at $64.24, a difference of $1.76 per machine.

In considering the bids thus submitted and making its selection for recommendation to the directors, it immediately became apparent to the committee that the type of meter to be selected was an important factor in determining which machine would be the most desirable for use by the city, and, after a thorough test and inspection of the various meters offered, the committee decided that the most desirable type for Philadelphia was the single-head automatic meter, that the manually operated machine was the least desirable of all three types, and that the Park-o-Meter, the price of which was the lowest in the single-head automatic class, did not meet the specifications in at least one important particular, which will be referred to hereafter. This left the Dual parking meter as the lowest responsible bidder in that class.

In the light of these findings by the committee, it decided to recommend the Dual parking meter for selection by the directors, who were required to make the final decision and award the contract.

As bids had been invited for parking meters generally, without regard to the type of meter offered, and the committee deemed the single-headed automatic most suitable for use in this city (a conclusion concurred in by the directors, who had also examined

and compared the various samples submitted), the opinion of the city solicitor was sought as to the validity of awarding the contract to the Dual Parking Meter Company as the lowest bidder, since the Park-o-Meter had failed to meet one of the important requirements of the specifications. The city solicitor thereupon advised the committee and the directors that, in view of the manner in which the bids had been invited, an award to any company other than the one offering the lowest priced manually operated meter would be invalid. He advised them, however, that it would be lawful to reject all the bids, redraw the specifications so as to call for alternative bids on the basis of a classification of meters according to type and to invite a new bidding, expressly reserving to themselves the right given to them by section 16 of the ordinance of May 11, 1948, "to reject all proposals and/or invite new proposals which will satisfy them that it is to the best interest of the city to accept any particular proposal and direct the bidder to proceed with the installation of the meters". The city's right to adopt this course is fully sustained by the decision of the Supreme Court in American Pavement Company v. Wagner, 139 Pa. 623; Brener v. City of Philadelphia, 305 Pa. 182; Mazet v. Pittsburgh, 137 Pa. 548. Had the city authorities realized the real importance of considering the type of meter to be used in making their selection as to what should be bought, they would have been fully justified in requesting bids only for the type of meter they thought would serve the best interest of the city. By classifying the meters according to type, therefore, and in requesting alternate bids on that basis, postponing their ultimate decision as to type by the reservation of the right to do so after bids were received, they merely did what in another way they could have lawfully done before asking for any bids at all. Bidders would have had

no possible ground for complaint, and we can see no legal or logical reason for holding that by inviting alternate bids on the second bidding, the final award of the contract under it was thereby rendered unlawful.

Following this advice, the bids were all rejected, a new set of plans and specifications were prepared calling for alternate bids, and in response to that call new bids were submitted on the alternative basis by the same companies, and in the same amounts, as follows:

| Manually Operated Meters | | Automatic Meters | |
|---|---|---|---|
| | | Double-Headed | Single-Head |
| Miller | $74.00 | Alfco    $82.90 | Superior    $81.34 |
| Mark Time | 62.00 | | Huskey    73.67 |
| Mico | 59.50 | | Dual    66.00 |
| Keystone | 51.50 | | Park-o-Meter 64.24 |

Upon considering these bids there was unanimous agreement between the directors and the advisory committee that the single-head automatic meter was by far the most desirable. The manually operated type was deemed the least desirable of all, and hence that type was rejected. The choice between the single and double-headed automatic type of meters created a different problem. The price of the double-headed meter was higher than any of the single-headed machines offered, but that meter might be considered as lower than the single-headed meters in price, if it is considered that one machine would control two parking spaces. This was a distinct advantage from the standpoint of price alone, and had the price been the only consideration that entered into its desirability it would appear to have been the lowest bid. There are other important factors to bear in mind, however, which furnished ample reason for rejecting the double in favor of the single-headed automatic type. The double-headed machine would be unsuitable in many specific locations, as, for instance, at street corners,

in spaces adjoining areas set aside for loading and unloading, in front of fire houses, and other places where parking would be entirely forbidden. At such locations the very much higher priced double-headed machine would serve only one space, its second head being useless. For the same reason the interchanging of meters between locations would be hampered by such a machine. So, also, damage to a double-headed meter, which necessitated its removal for repairs, would throw out of commission two spaces instead of one. Various other considerations of a more or less similar character detract from the desirability of that type of machine, and justify the selection of the single-head automatic machine.

The selection of the type to be finally determined upon presented a question of real importance, which it was within the sole province of the directors to determine after consultation and advice from the advisory committee. It was not a trivial and unimportant distinction. It was a real one, for them alone to decide, and their decision cannot be overruled by us, unless it is shown to be arbitrary, capricious, or fraudulent. That it was not arbitrary or capricious is manifest from the very nature of the problem, and plaintiff failed to produce the slightest evidence to even suggest fraud or bad faith on the part of the directors and the members of the committee in deciding that the best interests of the city required the adoption of the single-head automatic type of machine.

A vigorous attempt was made by plaintiff in cross-examining the director of purchases and supplies, the members of the committee, and its secretary, Robert A. Mitchell, who was also the city highway engineer, to cast discredit upon the motives and reasons for their reaching their unanimous choice of the single-headed meter. These efforts utterly failed and the mere insinuations attempted to be injected into the case by

a line of questions which was immediately refuted by the answers to them, was not supported by a single other witness. While, as we have already said, it is not for us to sit in review on the directors' final selection of the single-head meter, it may not be amiss to state, in conclusion, that our own judgment upon the superiority of that meter coincides entirely with that of the city authorities.

Having rejected for these reasons the double-headed automatic type of machine, the single-headed type alone remained as the final choice of the directors, and in this group, it was shown by indisputable testimony that the Park-o-Meter offered by the lowest bidder could be readily manipulated so as to give free parking time, and this was confirmed by actual demonstration before us at the hearing, where the Park-o-Meter was repeatedly so "rigged". On the other hand, it was also demonstrated that the Dual parking meter could not be manipulated. Although admitting that his machine did not meet the specifications in this particular, the representative of the Magee-Hale Company, which offered the Park-o-Meter, testified that the tamperability of a machine was not considered an important factor in the trade, because an attempt to tamper with it could be detected by other persons in the neighborhood at the time. This effort to overcome a fatal objection to his machine was bound to fail for two obvious reasons, first, because the proposition that a machine capable of being so manipulated is as desirable as one that cannot be is ridiculous and falls of its own weight, and, second, because the obvious advantage of untamperability required by the specifications was fully met by the Dual parking meter. In these circumstances, the Park-o-Meter was properly rejected for its failure to meet the specifications, and the contract was lawfully awarded to the Dual Parking

Meter Company, which thereby became the lowest responsible bidder.

For the foregoing reasons we are satisfied that the contract in question was lawfully awarded to the Dual Parking Meter Company, and that plaintiff has completely failed to establish his right to the equitable relief he seeks.